UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                                             Case No. 20-CR-105

JOHN LA FAVE,

          Defendant.

---

## PLEA AGREEMENT

---

1.     The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and William J. Lipscomb and Gregory J. Haanstad, Assistant United States Attorneys, and the defendant, John La Fave, individually and by attorney Michael L. Chernin, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.     The defendant has been charged in a one-count information, which alleges a violation of Title 18, United States Code, Section 1343.

3.     The defendant has read and fully understands the charge contained in the information. He fully understands the nature and elements of the crime with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.  The defendant voluntarily agrees to plead guilty to Count One of the information, set forth in full in Attachment A.

6.  The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove beyond a reasonable doubt the facts in Attachment B. The defendant admits that these facts are true and correct and that they establish his guilt beyond a reasonable doubt.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

7.  The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum penalties: 20 years' imprisonment; a $250,000 fine; and three years of supervised release. The count also carries a mandatory special assessment of $100. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 28 of this agreement.

8.  The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.  The parties understand and agree that in order to sustain the wire fraud charge in the information, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant knowingly devised or participated in a scheme to defraud;

Second, the defendant did so with intent to defraud;

2

Third, the scheme involved a materially false or fraudulent pretense or representation; and

Fourth, for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications in the manner charged in the information.

## **SENTENCING PROVISIONS**

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The defendant acknowledges and agrees that his attorney has discussed the potentially applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the information is seven under Sentencing Guidelines Manual § 2B1.1(a)(1).

## Specific Offense Characteristics

17. The parties agree to recommend to the sentencing court that, because the loss associated with the offense is more than $40,000, a six-level increase to the offense level is applicable under Sentencing Guidelines Manual § 2B1.1(b)(1)(D).

## Abuse of Position of Trust

18. The parties agree to recommend to the sentencing court that, because the defendant abused a position of public trust, a two-level increase to the offense level is applicable under Sentencing Guidelines Manual § 3B1.3.

4

### Acceptance of Responsibility

19. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government will make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

### Sentencing Recommendations

20. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22. The parties acknowledge, understand, and agree that the government will recommend a sentence within the applicable sentencing guideline range, as determined by the court.

### Court's Determinations at Sentencing

23. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum

penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

### Special Assessment

27. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## Restitution

28. The defendant agrees to pay restitution in the amount of $89,000 to the State of Wisconsin. The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S WAIVER OF RIGHTS

30. In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

- a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

- b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

- c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

- d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present

witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

31. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

32. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

33. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

34. Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction

proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statute or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

### Further Civil or Administrative Action

35.  The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

36.  The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

37. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

38. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## **EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT**

39. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

40. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 6/18/2020

JOHN LA FAVE
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 06/18/20

MICHAEL L. CHERNIN
Attorney for Defendant

For the United States of America:

Date: 6/24/2-

for MATTHEW D. KRUEGER
United States Attorney

Date: 6/24/20

for WILLIAM J. LIPSCOMB
Assistant United States Attorney

Date: 6/24/20

for GREGORY J. HAANSTAD
Assistant United States Attorney

12

# Attachment A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.

JOHN LA FAVE,

        Defendant.

Case No. 20-CR-

[18 U.S.C. § 1343]

---

## INFORMATION

---

**THE UNITED STATES ATTORNEY CHARGES THAT:**

1. Beginning by approximately April of 2011, and continuing through at least December of 2017, in the State and Eastern District of Wisconsin and elsewhere,

**JOHN LA FAVE,**

with intent to defraud, knowingly devised and executed a scheme to defraud Milwaukee County and to obtain money by means of materially false and fraudulent pretenses and representations, and knowingly caused wire communications to be transmitted in interstate commerce for the purpose of executing the scheme.

### Background

2. At all times relevant to this information:

    a. John La Fave was the Milwaukee County Register of Deeds and in that position was responsible for, among other things, maintaining records, providing certified copies of birth, death, marriage, and military discharge records, and collecting real estate transfer taxes.

    b. "Business A" was an internet technology service provider that contracted with Milwaukee County to provide redacting and document indexing services.

    c. "Individual A" worked for Business A and was responsible for issuing invoices to clients for work that Business A had performed.

## The Scheme to Defraud

3. The essence of La Fave's scheme was to defraud Milwaukee County and to obtain money by directing Individual A to create fraudulent invoices that falsely made it appear that Business A had done specified work for the Milwaukee County Register of Deeds Office when, as La Fave knew, Business A had not actually performed that work.

4. As part of the scheme:

   a. La Fave regularly directed Individual A to create false invoices for work not performed by Business A, and specified the precise amount to be falsely invoiced; Individual A in turn would submit to La Fave, via email, false invoices in the amounts directed by La Fave.

   b. La Fave then would direct the invoices to Milwaukee County accounts payable, thereby causing the Milwaukee County Treasurer to issue checks to Business A for work Business A had not performed.

   c. At La Fave's direction, Business A would deposit and temporarily hold "on account" most of the money it received from Milwaukee County. The purpose of temporarily holding the money in this way was to create a pool of money that could later be used to pay third-party vendors who actually performed the work that La Fave and Business A had falsely represented was performed by Business A.

   d. La Fave directed the third-party vendors to submit their invoices to Business A, where Individual A would either (1) cause the invoices to be paid from the pool of fraudulently obtained money it was holding on account, or (2) repackage the invoices onto Business A invoices and submit them to Milwaukee County for payment as though Business A, and not third party vendors, had done the work detailed on the invoice.

   e. When Individual A repackaged the third-party invoices onto Business A invoices, he would typically (1) add a "project technician fee" in an amount equal to approximately five percent of the third-party bill, and (2) ultimately pay the third-party vendors at a rate of less than half of what the county was paying Business A for the work the vendors had done.

   f. Most of the third-party vendors paid under this scheme were not authorized to be paid through the Milwaukee County accounts payable process, and some were employees of the Milwaukee County Register of Deeds Office.

5. As an example of how La Fave's fraud scheme operated:

    a. On September 30, 2016, a third party sent an email to Individual A that included an invoice for $15,083.08 for indexing services that the third party had performed for the Register of Deeds Office. Individual A then sent an email to La Fave requesting approval for payment of the invoice from funds Business A was, at La Fave's direction, holding on account. In response, La Fave sent an email to Individual A that read, "APPROVED." Individual A then sent an email to La Fave with an attached invoice falsely indicating that the work Business A had done reflected the $15,083.08 amount for indexing services, plus a project technician fee of $750. Business A did nothing under the terms of its contract with Milwaukee County to justify payment of this fee which, ultimately, Business A paid itself from money it had received from Milwaukee County and that it had been holding on account at La Fave's direction.

6. As a result of his scheme, La Fave fraudulently obtained and attempted to obtain at least $89,000.

## Execution of the Scheme

7. On or about September 30, 2016, for the purpose of executing the above-described scheme to defraud, and attempting to do so, in the State and Eastern District of Wisconsin and elsewhere,

**JOHN LA FAVE,**

with intent to defraud, caused to be transmitted by means of wire communication in interstate commerce an email from La Fave to Individual A, in which La Fave approved payment of a Business A invoice that (1) included a $750 project technician fee, and (2) falsely reflected that Business A had performed the work detailed on the invoice when, in fact, a third-party had performed that work.

All in violation of Title 18, United States Code, Section 1343.

## Forfeiture Notice

1.  Upon conviction of the wire fraud offense in violation of Title 18, United States Code, Section 1343, set forth in the information, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense of conviction. The property to be forfeited includes, but is not limited to, a sum of money equal to the proceeds derived from the offense or offenses.

2.  If any of the property described above, as a result of any act or omission by the defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

_____
MATTHEW D. KRUEGER
United States Attorney

_____
Date

# Attachment B

John La Fave was the elected Register of Deeds ("ROD") for Milwaukee County ("the County") from 2003 until his retirement in April of 2019. Milwaukee County is a municipal entity that annually receives federal funds. The ROD office is responsible for maintaining records, and providing certified copies, of certificates of birth, death, marriage, and military discharge. Carrying out those responsibilities entails large-scale indexing and redacting work.

Between 2010 and 2017, much of the indexing and redacting work was facilitated by Business A, an internet technology service provider that contracted with Milwaukee County to provide redacting and document indexing services for the ROD office. Business A and Milwaukee County entered into a "master price agreement," a type of purchase contract used to make regular, repeated purchases of specified items at fixed prices for a set period of time. Under the terms of the master price agreement, Milwaukee County agreed to pay Business A $0.09 per page for document services (e.g., social security number redaction), and $0.79 per page for document indexing services

Beginning at least by April of 2011 and continuing through at least December of 2017, La Fave and employees of Business A executed a scheme to evade the County budgeting and procurement rules and processes. The scheme was designed to give La Fave control over funds belonging to Milwaukee County outside of the budgeting and procurement process. In his capacity as ROD, La Fave was subject to County budgeting and procurement rules and regulations. In interviews with investigators and the prosecution team, La Fave advised that he directed the disposition of money outside the County procurement process, and manipulated the ROD budget, so as to avoid having to go to the County Board for purchases and decisions on vendors.

To effectuate the scheme, La Fave regularly directed Individual A, an officer with Business A, to create invoices that falsely reflected that Business A had completed work for the office of the Register of Deeds when, in fact, Business A had not performed the work. As a result of the submittal of the false invoices, the County paid Business A for work Business A had not actually performed. Business A then held "on account" the money it received from the County through the false invoice scheme until directed by La Fave as to how to use the money. Through the scheme, and as directed by La Fave, Business A submitted false invoices for more than $2.3 million dollars to the County, funds that were then paid to Business A by the County. At La Fave's direction, Business A held much of this money on account for La Fave to use outside of the County budgeting and procurement processes. As directed by La Fave, Business A used the funds on account to pay third parties, who did not have contractual agreements with the County, and to pay Business A for work later performed by Business A.

Emails between Individual A, La Fave, and others document how the scheme was executed.

On April 3, 2014, La Fave sent an email to Individual A requesting that Individual A generate a false invoice to Milwaukee County in the amount of $135,661.60. In the email, La Fave instructed Individual A to detail in the invoice that $44,892.18 should be claimed for

1

redaction services and $90,769.42 should be claimed for indexing. On April 9, 2014 Individual A sent an email back to La Fave with an invoice for $135,661.60. The invoice detailed indexing and redaction services as La Fave had directed. At the time that Business A submitted the invoice, it had not performed the indexing and redaction services. In May of 2014, the County issued a check to Business A for funds that included the $135,661.60. Business A then held those funds on account for La Fave to use later.

On October 2, 2014, La Fave sent an email to Individual A with the subject line "create an invoice to add to money on account." In the email, La Fave directed Individual A to create an invoice including $28,651.50 for redaction services and $107,677.00 for indexing services, for a total of $136,328.50. Individual A responded the same day with an email to La Fave asking what was going to be done with the $700,000 already being held by Business A on account for La Fave's use. La Fave responded with a projection of how he would use the money, including payments to a third party who was doing work for the County. In response, on the same date, Individual A sent an email back to La Fave with an invoice for $136,328.50 that included the detail La Fave had requested for redaction and indexing services which Business A had not performed. The County subsequently issued a check to Business A that included the $136,328.50 falsely invoiced.

On December 1, 2014, La Fave sent an email to Individual A requesting an invoice to "spend Up Funds" budgeted by the County for the Register of Deeds office. La Fave noted that the funds were "use it or lose it" and that "holding it with [Business A] was a nice way to deal with it." On December 2, 2014, La Fave sent an email to Individual A with the subject line "create an invoice to add money to 'funds held on account". In the email, La Fave directed Individual A to create an invoice to include $17,477.37 for redaction services and $65,682.97 for indexing services, for a total of $83,160.34. On December 2, 2014, Individual A sent an email back to La Fave with a false invoice with amounts and justification detail matching La Fave's request. Milwaukee County subsequently issued a check to Business A to pay the false invoice.

On December 8, 2015, La Fave sent an email to Individual A requesting another false invoice to the County from Business A. In the email, La Fave wrote "We need it by tomorrow to pay for it from 2015 budget." La Fave requested an invoice for $9,006.00 for indexing that Business A had not performed. Individual A responded via email that same date with a false invoice that matched La Fave's request. Milwaukee County subsequently issued a check to Business A to pay the false invoice.

In part, the County funds that Business A "held on account" and "spent up" for La Fave were used to pay third parties; some of these third parties were not authorized through the County procurement process to provide services to the County or to receive County funds. Business A, on behalf of and as directed by La Fave, paid third parties from County funds Business A held on account for La Fave for work the third parties had performed for the ROD office outside of the regular procurement process. Instead of submitting invoices to the ROD, these third party-vendors were directed by La Fave to submit their bills to Business A, who would then pay the vendors either from the monies on account from the false invoice scheme, or by repackaging the third-party invoices onto a Business A invoice and submitting it to Milwaukee County for payment, as directed by La Fave. Some of these third-party vendors were

2

not authorized to be paid through the county accounts payable process because they did not have contracts or a master price agreement with Milwaukee County. The third-party vendors paid under this scheme included employees of the ROD who did redacting work outside of ROD business hours.

When it was time to pay the third-party vendors for work performed outside of contracts with the ROD, Individual A, on behalf of Business A, would forward the original invoice from the third-party vendor to La Fave for "approval" and would ask whether the invoice should be paid by "funds on account" (i.e., the money being held by Business A for the false invoices) or whether the invoice should be sent directly to Milwaukee County Accounts Payable for payment. After La Fave approved the payment method, Individual A would repackage the third-party invoice onto a Business A invoice.

The invoices from Business A for payment of third party vendors typically contained an add-on service fee from Business A referenced as a "project technician fee." The project technician line item of $125 per hour was included in the Business A master price agreement, part of Business A's contractual relationship with the County. Under the false invoice scheme, the amount Business A charged for project technician work would equal approximately 5% of each third-party bill. Essentially, with regard to the false invoice scheme, the project technician charge was used to pay Business A for submitting the false invoices to Milwaukee County and then holding the money they received from Milwaukee County for future payments. Under the false invoice scheme, Business A obtained at total of at least $89,000 in "project technician fees" that it was not authorized to receive under its contract with the County.

When La Fave directed Individual A to pay an invoice from "funds held on account," Individual A would subtract the invoiced amount from the pool of money Business A had previously received from prior false invoices and would send La Fave a spreadsheet reflecting the monthly accounting of the funds being held and the invoices that had been paid from those funds.

For example, on September 30, 2016, a third party sent an email to Individual A that included an invoice for $15,083.08 for indexing services it had performed for the ROD office. Individual A then sent an email to La Fave requesting approval for payment of the invoice from funds Business A was holding on account. La Fave responded in an email with "APPROVED." Individual A then sent an email to La Fave with a Business A invoice containing the amount paid to the third party plus a project technician fee of $750. Business A had done nothing under the terms of its contract with the County to justify payment of this project technician fee which, ultimately, Business A paid to itself from funds it had received from the County and that it was holding on account for La Fave.